UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

LOU COLASANTI,

          Plaintiff,

    v.

CITY OF PORTLAND and STATE OF
OREGON,

          Defendants.

Case No. 3:19-cv-00443-YY

OPINION AND ORDER

YOU, Magistrate Judge.

      Defendants City of Portland ("City") and State of Oregon ("State") have filed motions for

summary judgment against plaintiff's claims arising from his suspension from the police officer

basic training course ("academy") conducted by the Department of Police Standards and

Training ("DPSST") and subsequent termination from the Portland Police Bureau ("PPB").[1]  The

claims that remain against the City are:

          First Claim: Title I, ADA discrimination claim under 42 U.S.C. §
          12112(a);

          Second Claim: Title I, ADA interference "in the exercise or enjoyment"
          claim under 42 U.S.C. § 12203(b); and

---

[1] Plaintiff has filed additional briefing and evidence on these motions.  Supp. Memo, ECF 120;
Supp. Decl. ECF 121.  The City has objected to the court's consideration of these submissions,
asserting that they are improper under Local Rule 7-1(f)(3) because they were filed without prior
permission from the court.  ECF 122.  The court has not considered these submissions is
determining the outcome of the motions for summary judgment; furthermore, the information
therein contained would not alter this decision.

> Third Claim: State law disability discrimination claim under O.R.S. 659A.112.

*See* Findings and Recommendations, ECF 65, *adopted by* Order, ECF 67.  The only remaining claim against the State is plaintiff's Fourth Claim—a Title I ADA interference "in the exercise or enjoyment of" claim under 42 U.S.C. § 12203(b).  *Id.*

The City's motion for summary judgment is granted as to plaintiff's discrimination claim based on disparate impact and failure to engage in the interactive process, but denied as to the disparate treatment claim.  Defendants' motions for summary judgment against plaintiff's interference claim are granted in part and denied in part as further explained in this opinion and order.

## I.    Summary Judgment Standard

Under Federal Rule of Civil Procedure 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  The party seeking summary judgment bears the initial burden of showing the absence of a genuine issue of material fact by citing to the record, including "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The nonmoving party must then "go beyond the pleadings" and identify in the record "specific facts showing that there is a genuine issue for trial."  *Id.* at 324.

Only disputes over facts that are outcome determinative preclude the entry of summary judgment.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Furthermore, the dispute must be genuine, "such that a reasonable jury could return a verdict for the nonmoving party."  *Id.*  In this circuit, "a plaintiff in an employment discrimination action need produce very little evidence in order to overcome an employer's motion for summary judgment."  *Diaz v.*

*Eagle Produce Ltd. Partnership*, 521 F.3d 1201, 1207 (9th Cir. 2008).  This is "because the ultimate question is one that can only be resolved through a searching inquiry—one that is most appropriately conducted by the factfinder, upon a full record."  *Schnidrig v. Columbia Mach.*, *Inc.*, 80 F.3d 1406, 1410 (9th Cir. 1996) (internal quotation omitted).  The Ninth Circuit has subsequently cautioned, however, that this high standard is not a bar to "summary disposition of meritless suits but simply ensure that when a material fact exists a civil rights litigant will not be denied a trial on the merits."  *Fed. Deposit Ins. Corp. v. Henderso*n, 940 F.2d 465, 473 (9th Cir. 1991) (quoting *Lowe v. City of Monrovia*, 784 F.2d 1407, 1407 (9th Cir. 1986)).

The court "does not weigh the evidence or determine the truth of the matter, but only determines whether there is a genuine issue for trial."  *Balint v. Carson City, Nev.*, 180 F.3d 1047, 1054 (9th Cir. 1999).  The evidence of the nonmovant must be believed, and all rational and reasonable inferences are drawn in the nonmoving party's favor.  *United Steelworkers of Am. v. Phelps Dodge Corp.*, 865 F.2d 1539, 1542 (9th Cir. 1989).

## II.    Exhaustion

The parties do not dispute that, as a threshold matter, exhaustion of administrative remedies is a mandatory prerequisite to bringing suit under the ADA.  *See Abdul-Haqq v. Kaiser Found. Hosps.*, 669 F. App'x 462 (9th Cir. 2016) (noting that 42 U.S.C. § 12117(a) extends the Title VII exhaustion requirement to ADA claims).  To demonstrate exhaustion, plaintiff must show that he presented his federal claims to the Equal Employment Opportunity Commission ("EEOC") or that his federal claims are "like and reasonably related" or "reasonably could be expected to grow out of" the allegations he presented to the EEOC.  *Yamaguchi v. U.S. Dep't of the Air Force*, 109 F.3d 1475, 1480 (9th Cir. 1997); *Leong v. Potter*, 347 F.3d 1117, 1122 (9th Cir. 2003).

The Ninth Circuit has instructed that, to determine whether a plaintiff has exhausted claims not specifically raised to the EEOC, "it is appropriate to consider such factors as the alleged basis of the discrimination, dates of discriminatory acts specified within the charge, perpetrators of discrimination named in the charge, and any locations at which discrimination is alleged to have occurred." *B.K.B. v. Maui Police Dep't*, 276 F.3d 1091, 1100 (9th Cir. 2002), *as amended* (Feb. 20, 2002); *see also Freeman v. Oakland Unified Sch. Dist.*, 291 F.3d 632, 637 (9th Cir. 2002) ("[T]he inquiry into whether a claim has been sufficiently exhausted must focus on the factual allegations made in the charge itself, describing the discriminatory conduct about which a plaintiff is grieving.").

The parties dispute whether the City is barred from asserting that plaintiff has failed to exhaust on the basis that the City has waived this argument by raising it for the first time, at this late stage of the case. The parties also dispute whether plaintiff sufficiently raised his interference claim to the EEOC.[2] In support of its position, the City identifies a case from the Western District of Virginia in which the court found that the plaintiff had not exhausted her ADA interference claim because the allegations in her EEOC charge concerned only disability discrimination and interference is "a separate and distinct legal theory." *Rausch v. Alta Cima Corp.*, No. 7:21-CV-00476, 2023 WL 2227727, at *6 (W.D. Va. Feb. 24, 2023). Notably, the court emphasized that the timeline of events described in the EEOC charge began with the plaintiff's termination, and the interference claim asserted in the federal complaint was based on

---

[2] In its motion for summary judgment, the City asserted that plaintiff's failure to obtain a right-to-sue letter from the EEOC prior to filing this lawsuit barred this entire action; however, in light of the EEOC's subsequent admission that it made a mistake and issuance of the right-to-sue letter, the City has conceded that this argument is moot. City Reply 5, ECF 114; Snyder Decl. 67, Ex. 31, ECF 107 (communications with EEOC); Snyder Decl. 69, Ex. 32, ECF 107 (right-to-sue letter).

events that occurred during the plaintiff's employment. *Id.* The court found that the plaintiff had "not state[d] anywhere in her narrative facts giving rise to an interference claim." *Id.*

Even assuming the City has not waived this argument, plaintiff has demonstrated that he exhausted his administrative remedies on his interference claim. Although plaintiff's EEOC complaint does not use the word "interference" or cite 42 U.S.C. § 12203(b), it does cite Title I of the ADA. It also identifies the same interactions and actors that give rise to plaintiff's interference claim in federal court, describing the events in similar detail and even employing similar phrasing. *See* Tu Decl., Ex. 37, ¶¶ 18, 23, ECF 90 (describing plaintiff's interactions with William Goff, Michael Stradley, and Don Sedlacek); Second Am. Compl. ¶¶ 33–35, ECF 43 (same). *Rausch*, therefore, is inapposite. Far from being bereft of facts of relevant allegations, plaintiff's EEOC complaint contains the substantive, material allegations underlying the interference claim that he raises here. Otherwise stated, an interference claim "reasonably could be expected to grow out of" the allegations plaintiff presented to the EEOC. *Yamaguchi*, 109 F.3d at 1480. Therefore, plaintiff has exhausted his administrative remedies.

### III.    Disability Discrimination Claim Against the City

Plaintiff asserts that the City discriminated against him based on his disability in violation of the ADA and O.R.S. 659A.112 by terminating his employment after he failed the midterm exam and failing to engage in an interactive process with him regarding a reasonable accommodation for the mandatory physical and written exams. Second Am. Compl. ¶¶ 51–67, 76–92, ECF 43. In response to the City's motion for summary judgment, plaintiff clarified that he is pursuing only a disparate treatment claim, and not a disparate impact claim. Resp. 32, ECF 106. Thus, to the extent the City moves for summary judgment against any disparate impact claim, the motion is granted.

A.    **Disparate Treatment**

The ADA analytical framework applies to disability discrimination claims brought under Oregon state law. *See Snead v. Metro. Prop. & Cas. Ins. Co.*, 237 F.3d 1080, 1087 (9th Cir. 2001) ("The standard for establishing a prima facie case of discrimination under Oregon law is identical to that used in federal law."); *see, e.g.*, *James v. Oregon Sandblasting & Coating, Inc.*, No. 3:15-CV-01706-HZ, 2016 WL 7107227, at *3 (D. Or. Dec. 4, 2016) (applying same analysis to the plaintiff's ADA and state law disability discrimination claims). Accordingly, the following analysis applies to both plaintiff's ADA and Oregon law claims.

On summary judgment, ADA discrimination claims are evaluated under the *McDonnell-Douglas* burden-shifting framework, which places the initial burden on the plaintiff to present a prima facie case of unlawful discrimination. *Raytheon Co. v. Hernandez*, 540 U.S. 44, 49–50 (2003); *Curley v. City of N. Las Vegas*, 772 F.3d 629, 632 (9th Cir. 2014) ("Discrimination and retaliation claims under the ADA are both subject to the burden-shifting framework outlined in *McDonnell Douglas Corp. v. Green*.") (internal citation omitted). If the plaintiff meets this burden, the defendant must show that it had a legitimate, nondiscriminatory reason for its action. *Raytheon*, 540 U.S. at 50. At the final step of the analysis, the plaintiff must establish that the defendant's proffered reason is pretextual. *Id.* at 52.

The ADA prohibits employers from "discriminat[ing] against a qualified individual on the basis of disability." 42 U.S.C. § 12112(a). A "qualified individual" is an "individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). Thus, to state a prima facie case of discrimination under the ADA, a plaintiff must show "(1) that he is a disabled person within the meaning of the ADA; (2) that he is qualified, that is, with or without

reasonable accommodation (which he must describe), he is able to perform the essential

functions of the job; and (3) that the employer terminated him because of his disability."

*Kennedy v. Applause, Inc.*, 90 F.3d 1477, 1481 (9th Cir. 1996). The City argues that plaintiff has

failed to present evidence of the latter two elements—that he is qualified to perform the essential

functions of his position and that he was terminated because of his disability.[3] City's Mot.

Summary J. 17–19, ECF 89.

     "Qualification for a position is a two-step inquiry." *Bates v. United Parcel Serv., Inc.*,

511 F. 3d 974, 990 (9th Cir. 2007). "The court first examines whether the individual possesses

the 'requisite skill, experience, education and other job-related requirements' of the position."

*Id*. "The court then considers whether the individual 'can perform the essential functions of such

position' with or without a reasonable accommodation." *Id.*

     With respect to the first step, the City cites to the legal requirements pertaining to

certification as a police officer and argues that, because plaintiff failed the mandatory midterm

exam, he has not satisfied the job-related requirements of the position. City's Mot. Summ. J. 17,

ECF 89. In Oregon, a person "may not be employed as a police officer . . . for more than 18

months" without being "certified as being qualified as a police officer" pursuant to standards

established by the Board on Public Safety Standards and Training and training accredited by

DPSST. *See* O.R.S. 181A.410; O.R.S. 181A.490(1); *see also* O.A.R. 259-008-0060(3) ("Basic

certification is mandatory and must be acquired by all police officers . . . within 18 months of

employment . . . unless an extension is granted by the Department."). According to DPSST rule

O.A.R. 259-008-0085(20), "[a] public safety officer must have successfully completed the

---

[3] The City does not dispute that plaintiff is disabled under the ADA because of his congenital
heart defect. City's Mot. Summary J. 16, ECF 89.

mandated course for which certification is being request in order for the training to satisfy the minimum requirements for certification." Successful completion of the mandated course for police officers requires, among other things, that a person "[o]btain a minimum score of 75% on the midterm exam and final exam." O.A.R. 259-008-0085(21)(a)(C).

However, the ADA "does not require that a person meet each of an employer's established 'qualification standards,' . . . to show that he is 'qualified.'" *Bates*, 511 F.3d at 990. Moreover, it is plaintiff's failure to pass the midterm exam that lies at the core of plaintiff's discrimination claim. "[I]ndeed, it would make little sense to require an ADA plaintiff to show that he meets a qualification standard that he undisputedly *cannot* meet because of his disability and that forms the very basis of his discrimination challenge." *Id.* Here, the record shows that plaintiff had demonstrated academic proficiency—the average of plaintiff's quiz scores prior to the midterm was 88.35%—and plaintiff scored less than one percentage point below the passing grade on the midterm, at 74.38%. Tu Decl. 132, Ex. 23, ECF 90. A reasonable juror could find that had plaintiff received an accommodation to take the midterm when he was not fatigued from physical training due to his disability, he could have passed the exam.[4]

With respect to the second step, the City argues that plaintiff cannot perform the essential functions of the job, citing to plaintiff's termination from his subsequent employment as a police officer with the Minneapolis Park Police Department and an evaluating physician's recommendation that plaintiff was not fit to continue in police officer training, and asserts that plaintiff is currently unable to perform the functions of the job even with accommodations. Cit's Mot. Summ. J. 18, ECF 89; Tu Decl., Ex. 1 (Colasanti Dep.) at 32, ECF 90 at 40; Tu Decl., Ex.

---

[4] Plaintiff testified that on the day of the exam he was "extremely fatigued" "and had been very tired for many weeks at that point" due to exertion during physical training. Tu Decl., Ex. 1 (Colasanti Dep.) at 13, 27, ECF 90.

35, ECF 90 at 164-65. But the City's reference to plaintiff's termination from a subsequent police program and a physician's advisement against continued training is not probative of whether plaintiff was qualified at the time of his suspension from the academy. The Ninth Circuit has consistently prohibited reliance upon post hoc information to justify an employment decision. *See Dark v. Curry Cnty.*, 451 F.3d 1078, 1086 (9th Cir. 2006) ("Given the ADA's standard of causation and a plaintiff's opportunity to show pretext, it is clear that a rationale developed ex post by a reviewing body cannot wipe away the original discriminatory justification for an employee's termination."). Physical incapacity was not one of the reasons the City presented as a justification for plaintiff's termination—the City maintains that the reference in plaintiff's termination letter to plaintiff's failure to meet "physical standards" was a "scrivener's error" and that his termination "had nothing to do with his disability." City's Mot. Summary J. 19-20, ECF 89. Moreover, in evaluating whether a plaintiff is qualified, the relevant time period is at the moment the adverse action took place. *See Garcia v. Johnson*, 630 F. App'x 684, 686 (9th Cir. 2015) (holding that the plaintiff's medical reports from two years before and three years after his termination did not create a triable issue of fact as to whether he was qualified).

Then, turning to the final element of the prima facie case, the City does not dispute that plaintiff's termination from employment was an adverse employment action. City's Mot. Summary J. 19, ECF 89. However, the City asserts that plaintiff has failed to produce evidence that he was terminated because of his disability, rather than for failing the midterm. *Id.* This is also, essentially, the City's argument in support of its burden to present a nondiscriminatory reason for plaintiff's termination. *Id.* at 20.

The City contends that plaintiff's termination was mandatory, per DPSST Student Rules and Regulations § 2.18, which states that students who fail the midterm exam will be dismissed from the academy.  Ickes Decl., Ex. 1 at 77, ECF 88-1 ("Basic Police students . . . must obtain a minimum score of 75% on both the midterm exam and the final exam.  Failure . . . will result in dismissal from the Academy based on academic failure.").  Ultimately, this argument is unavailing.  In this instance, the adverse employment action was not mere termination; at issue, also, is the City's decision not to permit plaintiff to return to the academy.

Plaintiff has adduced testimony that other students have failed the midterm and been readmitted to the academy.  Snyder Decl., Ex. 37 (Gabliks Dep.) at 38, ECF 107 ("Q: Have any students failed a midterm and then been readmitted to the academy at a later time? A: Yes").  Plaintiff has also provided evidence that other students have failed other academic and non-academic aspects of the academy and have been retained or later returned for further training.  Snyder Decl., Ex. 40 (Leloff Dep.) at 14–15, ECF 107 ("[A]n academic failure is a suspension from the academy, and we have had times where the agency then makes a decision whether they want them to join another class, and they have been allowed to -- not join the same class, but they have been allowed to pull them back, work with the student, and then reenroll them into the academy."); Snyder Decl., Ex. 38 (Sedlacek Dep.) at 10–11, ECF 107 ("[W]e have had students who have academically failed, and their agencies kept them and sent them back through the academy from the start. . . . I can tell you that it's been more than a couple of times."); Snyder Decl., Ex. 36 (Goff Dep.) at 46, ECF 107 ("Q: You indicated that some people that failed parts of the DPSST basic academy -- such as firearms, patrol week, ORPAT -- had been brought back for -- had been allowed to graduate and had been brought back for additional training, and I think you said that that's sometimes referred to as recycling recruits. Can you tell me why Mr.

Colasanti was not recycled? A: Specifically I cannot tell you why he was not, why he wasn't recycled.").

This evidence, collectively, is sufficient to meet plaintiff's burden of showing pretext—where other students were given a second chance but plaintiff was not, a rational trier of fact could conclude that the City terminated plaintiff's employment because of his heart condition.[5] And, because plaintiff's ADA discrimination claim survives summary judgment, plaintiff's discrimination claim based on Oregon law likewise survives.

## B.    Interactive Process

"The ADA treats the failure to provide a reasonable accommodation as an act of discrimination if the employee is a 'qualified individual,' the employer receives adequate notice, and a reasonable accommodation is available that would not place an undue hardship on the operation of the employer's business." *Snapp v. United Transportation Union*, 889 F.3d 1088, 1095 (9th Cir. 2018) (citing 42 U.S.C. § 12112(b)(5)(A)). "Once an employer becomes aware of the need for accommodation, that employer has a mandatory obligation under the ADA to engage in an interactive process with the employee to identify and implement appropriate

---

[5] The City may point to testimony that one other individual was also dismissed for failing the midterm, as evidence that negates a finding of pretext. *See Snead*, 237 F.3d at 1094 ("This evidence also shows that at least one other similarly situated employee (Todd) was treated in a similar manner as Snead, thereby negating any showing of pretext."); *Lattimore v. Euramax Int'l, Inc.*, 771 F. App'x 433, 433 (9th Cir. 2019) ("Moreover, consistent with its reorganization plan, Euramax terminated the employment of a similarly situated, non-disabled employee who, like Lattimore, had previous performance issues and worked out of a location other than the business unit that she supported.").

The other individual who was dismissed was enrolled in the Academy prior to Colasanti (at an unspecified point between 2008 to 2020) and the circumstances surrounding her dismissal and the determination to prohibit her from returning to the Academy are not in the record. *See* Snyder Decl., Ex. 36 (Goff Dep.) at 50, ECF 107. As such, the court lacks sufficient information to determine whether this individual is similarly situated to plaintiff, and this fact alone is not sufficient to negate plaintiff's evidence that other individuals have failed the midterm and were permitted to return to the Academy.

reasonable accommodations." *Humphrey v. Mem'l Hosps. Ass'n*, 239 F.3d 1128, 1137 (9th Cir.

2001).  In the absence of an employee's request for an accommodation, "the interactive process

for finding a reasonable accommodation may be triggered . . . only when the employer (1) knows

that the employee has a disability, (2) knows, or has reason to know, that the employee is

experiencing workplace problems because of the disability, and (3) knows, or has reason to

know, that the disability prevents the employee from requesting a reasonable accommodation."

*Brown v. Lucky Stores, Inc.*, 246 F.3d 1182, 1188 (9th Cir. 2001) (internal quotations omitted).

Plaintiff posits that the City's obligation to engage in an interactive process was triggered

when he spoke with Sergeant Goff about his abnormal heart arrhythmia and expressed his

concern that his condition might impede his performance on exams.  Second Am. Compl. ¶ 26,

ECF 43; Resp. 33, ECF 106.  The City asserts that its obligation was not triggered because

plaintiff did not request an accommodation in advance of the midterm, and plaintiff has not

demonstrated that the City knew plaintiff's disability was causing workplace difficulties or

prevented him from requesting an accommodation.  City's Mot. Summary J. 24, ECF 89.

Regardless of whether the City knew that plaintiff's disability was causing him difficulty

in completing academy requirements, plaintiff has presented no evidence that the City knew or

had reason to know that his disability prevented him from requesting an accommodation.  *See*

*Wells v. Mut. of Enumclaw*, 244 F. App'x 790, 792 (9th Cir. 2007) (finding that employer's

obligation was not triggered where the plaintiff never "exhibit[ed] any behavior suggesting that

his dementia was so severe that he could not be expected to ask for help if he needed it").  To the

contrary, the record reveals multiple instances where plaintiff requested accommodations,

despite his disability, including immediately after he failed the midterm.  *See, e.g.*, Colasanti

Decl. ¶ 77 (requesting accommodation to retake midterm), ¶ 97 (requesting accommodations of

Minneapolis Police Academy), ECF 108; Ickes Decl., Ex. 1 at 19, ECF 88-1 (requesting

accommodations for peace officer training in Minnesota).  Thus, the City's motion for summary

judgment is granted as to plaintiff's discrimination claim based on failure to engage in an

interactive process.

## IV.     Interference Claim Against the City and State

Section 503(b) provides:

> It shall be unlawful to coerce, intimidate, threaten, or interfere with any individual
> in the exercise or enjoyment of, or on account of his or her having exercised or
> enjoyed, or on account of his or her having aided or encouraged any other
> individual in the exercise or enjoyment of, any right granted or protected by this
> chapter.

42 U.S.C. § 12203(b).

Plaintiff's interference claim is limited to the first prong of § 503(b), that the City and

State interfered with him "in the exercise or enjoyment of" his rights under the ADA.  *See*

Findings and Recommendations 11-18, 32-34, ECF 65, *adopted by* Order, ECF 67.  Plaintiff

claims that the City "interfered with [his] exercise of his right to seek accommodations for his

disability" and the State "intimidated and interfered with his attempts to request

accommodations."  Second Am. Compl. ¶¶ 69, 99, ECF 43.  To prevail, plaintiff must identify an

ADA-protected right, show that defendants intimidated or interfered with the exercise or

enjoyment of that right, and prove that he suffered a distinct and palpable injury as a result.  *See*

*Brown v. City of Tucson*, 336 F.3d 1181, 1194 (9th Cir. 2003); *Annenberg v. Clark Cty. Sch.*

*Dist.*, 818 F. App'x 674, 678 (9th Cir. 2020).  Requesting an accommodation is a protected ADA

activity.  *Coons v. Secretary of U.S. Dept. of Treasury*, 383 F.3d 879, 887 (9th Cir. 2004).

The terms "coerce, intimidate, threaten, or interfere" are not defined in § 503(b).  The

Ninth Circuit has instructed that the "construction and application of § 503(b) ought to be guided

by [the court's] treatment" of the Fair Housing Act ("FHA") interference provision, "as well as similar provisions" in the Family and Medical Leave Act ("FMLA") and National Labor Relations Act ("NLRA"). *Brown*, 336 F. 3d at 1191. In the FHA context, the Ninth Circuit has defined "interference" as "the act of meddling in or hampering an activity or process." *Walker v. City of Lakewood*, 272 F.3d 1114, 1129 (9th Cir. 2001) (quoting *Webster's Third New Int'l Dict.* 1178 (14th ed. 1961)). The definition of "interference" is "broadly applied to reach all practices which have the effect of interfering with the exercise of rights under the federal fair housing laws." *Brown*, 336 F.3d at 1191 (citing *United States v. City of Hayward*, 36 F.3d 832, 835 (9th Cir. 1994) (analyzing the FHA's anti-interference provision). However, "[c]learly, anti-interference provisions such as those contained in the FHA and ADA cannot be so broad as to prohibit 'any action whatsoever that in any way hinders a member of a protected class.'" *Id.*

In *Brown*, the Ninth Circuit held that some of the conduct that the plaintiff complained about did not rise to a violation under § 503(b), specifically comments that she was "sloughing off" and "goofing off," and reports that colleagues were complaining about her early departures and long lunches. *Id.* at 1193. However, the plaintiff also claimed she was threatened when the defendant demanded that she cease her medications and work evening shifts or face demotion or forced retirement. *Id.* The Ninth Circuit upheld the district court's denial of summary judgment on the interference claim, concluding that these were "actionable threats" and the "allegations of direct harm resulting" from these threats, specifically, "short-term memory problems" and feeling "extremely stressed, harassed, and pressured," "would constitute a violation of § 503(b) if proven at trial." *Id.*

Previously, this court examined whether there must also be a causal link between the employee's enjoyment of a protected right and the employer's conduct, i.e., whether the conduct

was in relation to or had a nexus to the exercise or enjoyment of an ADA right.  Findings and

Recommendations 10, ECF 65, *adopted by* Order, ECF 67; *see Bayer v. Neiman Marcus Group,*

*Inc.*, 843 F. App'x 74, 76, 76 n.1 (9th Cir. 2021).  In *Bayer*, the plaintiff argued that any conduct

that "tends to chill" the exercise of ADA rights violates § 503(b), while the defendant argued that

§ 503(b) requires a showing of a causal link between the protected conduct and the adverse

action.  843 F. App'x at 76 n.1; *see also Bayer*, 2018 WL 2427787 at *7 (discussing issue and

citing cases); *Tankersley v. MGM Resorts Int'l*, No. 2:20-cv-00995-RFB-DJA, 2021 WL

1234505, at *3 (D. Nev. Mar. 31, 2021) (citing *Brown* and requiring the plaintiff to establish "he

was subjected to interference, coercion or threats *in relation to* the exercise or enjoyment of that

right") (emphasis added); *Armstrong v. Newsom*, No. 94-CV-02307 CW, 2021 WL 933106, at *7

(N.D. Cal. Mar. 11, 2021) (citing *Brown* and requiring that "the threat, intimidation, or coercion

*has a nexus to* the exercise or enjoyment of an ADA right") (emphasis added).  The Ninth Circuit

did not decide this issue in *Bayer* or *Brown*, but found, in both cases, that there was "sufficient

evidence to prevail on [a] § 503(b) claim regardless of which legal standard applies."  *Bayer*, 843

F. App'x at 75 (citing *Brown*, 336 F.3d at 1191-93).

The same is the case here; even assuming a causal link is required, plaintiff has proffered

sufficient evidence to prevail on his § 503(b) claim.  During the pre-hiring process, plaintiff

participated in a psychological assessment and medical examination (including an exercise stress

test), during which he disclosed his congenital heart defect and history of surgeries.  Tu Decl.,

Ex. 9, ECF 90 at 98, 103; Colasanti Decl. ¶¶ 22, 23, ECF 108.  Plaintiff also explained that he

could not be tased or sustain blunt force trauma to his chest; in response, he was told he could

wear a protective vest.  Colasanti Decl. ¶ 23, ECF 108.  A "Pre-Placement Evaluation Report"

indicated that plaintiff could perform the job of police officer without restrictions, Snyder Decl.,

Ex. 10, ECF 107 at 34, and a "Final Report Law Enforcement Medical Examination" indicated that plaintiff met the physical standards set forth in O.A.R. 259-008-0010[6], with the proviso that "[a] history of organic cardiovascular disease will require further evaluation." *Id.*, Ex. 1, ECF 107 at 6. Both reports were signed by a nurse practitioner. Plaintiff thereafter received an offer letter of employment from PPB, Tu Decl., Ex. 9, ECF 90 at 106-07, and was sworn in as a PPB police officer on January 4, 2018. Colasanti Decl. ¶ 27, ECF 108.

During initial training with PPB, and before entering the academy, plaintiff told his training supervisor, PPB Sergeant William Goff, that he had a congenital heart defect and had undergone surgeries. Tu Decl., Ex. 1 (Colasanti Dep.) at 12, ECF 90 at 20; Colasanti Decl. ¶¶ 28-30, ECF 108; Snyder Decl., Ex. 12, ECF 107 at 37 (January 24, 2017 text messages from plaintiff to Sgt. Goff). Plaintiff claims Sgt. Goff asked, "Why are you telling me this?", and plaintiff explained it was because he had failed the Oregon Physical Abilities Test (ORPAT) during training, but after he asked for an accommodation, he passed it the second time. Colasanti Decl. ¶ 30, ECF 108. Plaintiff also told Sgt. Goff that he might get fatigued on physical drills, but would try his best, and hoped supervisors would not think he was lazy. *Id.* Plaintiff asked Sgt. Goff who else needed to know about his heart condition, and Sgt. Goff responded it was likely that no one else needed to know and "[i]t would probably not be an issue," and advised plaintiff to "[k]eep this to yourself." *Id.*; Tu Decl., Ex. 1 (Colasanti Dep.) at 12, ECF 90 at 20.

---

[6] O.A.R. 259-008-0010(8) states that "[p]rior to admittance into a basic training course, . . . all law enforcement officers or applicants must demonstrate the physical abilities to perform the critical and essential tasks of a law enforcement officer," and defines those abilities, including cardiovascular requirements. O.A.R. 259-008-0010(8)(F); *see also* O.A.R. 259-008-0010(8)(F)(iii)( indicating that "[l]aw enforcement officers or applicants who have a history of organic cardiovascular disease will necessitate further medical evaluation").

Upon entering the academy, plaintiff's immediate supervisors were Sgt. Goff and DPSST

Class Coordinator Donald Sedlacek.  Colasanti Decl. ¶ 38, ECF 108.  Plaintiff attests, "I knew of

no procedure at the DPSST academy to request accommodations for my disability," and claims

he was not provided any information that there was an ADA coordinator.  *Id.*

At the academy, plaintiff was directed to take the ORPAT again and failed it.  *Id.* ¶ 43.

He claims that "[b]efore taking the ORPAT, I did not tell the DPSST staff administering the

ORPAT that I have a congenital heart defect because Sergeant Goff had previously told me to

keep the information to myself."  *Id.*  While taking the ORPAT, plaintiff experienced fatigue,

had breathing difficulties, was coughing, tasted blood in his mouth, became dizzy, and felt that

he might faint.  *Id.*

After the test, plaintiff told the ORPAT instructor, JD Edwards, that he had a congenital

heart defect, felt fatigued and dizzy, tasted blood in his mouth, was coughing, and had breathing

problems.  *Id.* ¶ 45.  Edwards responded that it was normal to taste blood during the ORPAT and

did not ask plaintiff if he needed an accommodation.  *Id.*  Edwards did not tell plaintiff to report

his heart condition or difficulties with the ORPAT to anyone else.  *Id.*  Later that evening,

plaintiff became very ill, and was shaking in bed and coughing up blood all night.  *Id.* ¶ 46.

Plaintiff also attests that, at some point, the use of force coordinator, Scott Willadsen,

asked plaintiff about his heart condition, and his conversation with Willadsen was similar to the

one he had with Edwards.  *Id.* ¶ 57.  Plaintiff told Willadsen that he was coughing all of the time,

always fatigued, and concerned about his heart, but Willadsen did not provide him with any

advice or much of a response.  *Id.*

On January 24, 2018, plaintiff emailed Sedlacek as part of a required weekly reporting

assignment, and mentioned his "serious health condition" and that he could fatigue at a fast rate

in higher-intensity drills.  *Id.* ¶ 48.  That day, plaintiff also followed up with Sgt. Goff about his

concerns that his heart defect "was interfering with [his] ability to pass the ORPAT."  *Id.* ¶ 50.

Plaintiff shared with Sgt. Goff that he had tasted blood in his mouth, was dizzy and coughing,

and had problems breathing.  *Id.*  Sgt. Goff's reaction was "much like" Edwards' reaction.  *Id.*

Sgt. Goff told plaintiff there would be additional chances to pass the ORPAT and that he should

train to pass it.  *Id.*  Plaintiff expressed concern that he would never be able to pass the ORPAT

because of his heart condition, and described his heart condition in more detail, including that his

condition was permanent and he would always have limitations.  *Id.*  Sgt. Goff initially told

plaintiff that he would let all of the DPSST instructors know about his heart defect, but then

stated, "on second thought, I think you should tell the instructors yourself. I do not want to have

to get involved for legal reasons."  *Id.* ¶ 51.  Plaintiff responded that he would share his heart

condition with his instructors in writing because he "thought paper might be best," and Sgt. Goff

advised, "no, don't send an email, you should speak to your instructors in-person."  Then

Sergeant Goff said "maybe that's not a good idea either."[7]  *Id.*

On January 26, 2018, plaintiff and his classmates were addressed by DPSST instructor,

Michael Stradley, who derided them that this was the "worst class in recent memory, with the

most students of any class ever failing the ORPAT," and berated them for their lack of physical

fitness.  *Id.* ¶ 52.  Stradley also mentioned that his best friend had died of heart issues at a young

age because he did not work out hard enough and fell victim to heart issues that were

---

[7] In the Second Amended Complaint, plaintiff alleges that Sgt. Goff "told [him] that they already
talked about Plaintiff's heart condition before and he did not want Plaintiff to mention his heart
condition to him again."  Second Am. Compl. ¶ 33, ECF 43.  There does not appear to be
evidence regarding the latter part of this statement in the summary judgment record.

preventable.  Plaintiff was very upset by this speech and raised his hand to talk about his heart

defect, but Stradley said he did not want to hear any of their questions or concerns.  *Id.*

After class ended, plaintiff approached Sedlacek and confided that he had a congenital

heart condition and had undergone multiple surgeries.  *Id.* ¶ 53.  Plaintiff explained that his heart

condition "interfered with [his] ability to complete the ORPAT in the expected time," and he was

"worried about passing the ORPAT and [his] physical training."  *Id.*  Plaintiff asked whether the

ORPAT policy needed to be modified for him, which staff needed to know about his heart

defect, what could be done for him, and what he could do to help himself.  *Id.*  Sedlacek revealed

that he also had a heart condition, and told plaintiff, in a "warning tone," that he should not tell

other instructors at the academy about the details of his heart defect and instead focused on

plaintiff's performance.  *Id.*  He advised plaintiff that some people in the past had used their

heart conditions as an excuse.  *Id.*  They ended the conversation with plaintiff pledging to get

"one percent better every day," as Sedlacek taught in class.  *Id.*  Sedlacek did not tell plaintiff

that if he needed accommodations at the academy, he would have to talk to individuals at the

Portland Police Bureau and ask them to make accommodation requests for him.  *Id.*

As the weeks progressed, plaintiff put even more pressure on himself to excel physically.

*Id.* ¶ 54.  He participated in almost daily fitness drills, including maneuvering through obstacle

courses while wearing weighted vests and running while holding heavy rocks.  *Id.* ¶ 55.  Plaintiff

was on course to set an academy record for most physically improved; however, he became more

fatigued and anxious.  *Id*. ¶ 59.

On Monday, March 5, 2018, plaintiff was given a midterm test, after he had engaged in

physical training all weekend.  *Id.* ¶ 61.  Up until the midterm, plaintiff had done well on tests,

scoring 95.83%, 82.76%, 88.89%, and 86.96%, with an average score of 88.35%.  *Id.* ¶ 60.  He

also passed both firearms courses on his first attempt and was on target to receive a marksmanship ribbon. *Id.* However, on the day of the midterm, plaintiff was fatigued and overwhelmed. *Id.* Plaintiff scored 74.38% on the midterm, missing the passing score by .62%. *Id.* Plaintiff was suspended from the academy that day, *id.* ¶ 63; Snyder Decl., Ex. 5 (suspension letter), ECF 107 at 11, and directed to meet with Lieutenant Mahuna on March 6, 2018. Colasanti Decl. ¶ 70, ECF 108. Plaintiff told Lt. Mahuna that he had a heart defect and had performed poorly on the mid-term because he was fatigued from trying to improve his score on the ORPAT. *Id.* ¶ 69. Plaintiff asked for accommodations, and Lt. Mahuna responded, "What do you mean a disability?" *Id.* ¶ 70. According to plaintiff, Lt. Mahuna also said, "So what if you have a heart defect? The Police Bureau never knew about your heart condition." *Id.* When plaintiff said he was going to appeal his dismissal from the academy, Lt. Mahuna responded, "Good luck with that," and "You are done. You will not be recycled back into the Portland recruit program if your appeal fails." *Id.* ¶ 71. Plaintiff was subsequently terminated from PPB.

Any action—or more accurately, inaction—by Stradley, Edwards, or Willadsen does not rise to the level of meddling or hampering in the context of this case.[8] Their failure to ask plaintiff if he needed an accommodation or direct plaintiff on how to request an accommodation does not fall within the definition of meddling or hampering. "[T]here exists no stand-alone claim for failing to engage in the interactive process," *Snapp,* 889 F.3d at 1095, and plaintiff's interactive process claim otherwise fails for the reasons discussed above. *See Caudle v. Bristow Optical Company, Inc.,* 224 F.3d 1014, 1024 (9th Cir. 2000) (holding "[w]e are aware of no

---

[8] This is not to say that inaction can never constitute interference. *See*, *e.g.*, *Brea v. Heartland Exp., Inc. of Iowa*, No. CV-11-00042-PHX-GMS, 2012 WL 3263966, at *3 (D. Ariz. Aug. 9, 2012) ("Had Defendant not responded to Plaintiff's FMLA claim, that inaction would constitute 'interference' or 'restraint' with the employees' exercise of their rights.").

authority for the counter-intuitive proposition that nonfeasance can amount to interference," and affirming district court's grant of directed verdict on interference with contract claim when the evidence showed only that supervisor failed to assist plaintiff to avoid termination).

However, drawing all reasonable inferences in plaintiff's favor, his interference claim with respect to the actions of Sgt. Goff and Sedlacek survives. Plaintiff made repeated, detailed disclosures to Sgt. Goff and Sedlacek about his heart condition and voiced concern that his disability interfered with his ability to perform the physical requirements of the academy. Colasanti Decl. ¶¶ 50, 53, ECF 108. Plaintiff attests that, in response, Sgt. Goff told him to "[k]eep this to yourself," Tu Decl., Ex. 1 (Colasanti Dep.) at 12, ECF 90 at 20[9], and later advised him not to send anything to his instructors in writing and that speaking with them in person was "maybe . . . not a good idea either." Colasanti Decl. ¶ 51, ECF 108. Although plaintiff explained his condition was permanent, Sgt. Goff likened it to situations where "people struggle with driving and shooting and sometimes need to be re-tested in those areas." *Id.* ¶50. Sedlacek similarly treated plaintiff's condition as one he could train around. After plaintiff described his congenital heart defect to Sedlacek and asked whether the ORPAT policy needed to be modified for him, which staff needed to know about his heart defect, what could be done for him, and what he could do to help himself, Sedlacek responded in a "warning tone" that plaintiff should not tell other instructors at the academy about the details of his heart defect. *Id.* ¶ 53. Sedlacek mentioned that some people in the past had used their health condition as an excuse, and focused the conversation on plaintiff's performance. *Id.* In fact, they ended their conversation with a pledge that plaintiff would get "one percent better every day," as Sedlacek taught in class. Thus, both Sgt. Goff and Sedlacek instructed plaintiff not to share information related to his disability

---

[9] *See also* Colasanti Decl. ¶ 31, ECF 108.

and, essentially, to train harder instead, despite plaintiff's repeated requests for help regarding a permanent congenital heart defect that "interfered with [his] ability" to meet the physical demands of the academy. *See id.* ¶¶ 50, 53.

None of the actions by either Sgt. Goff or Sedlacek constitutes intimidation—there is no evidence in the record that their actions frightened plaintiff. *Walker*, 272 F.3d at 1129 ("'Intimidation' would require a showing that the City's activities had generated fear in the [plaintiff].") (citing *Webster's Third New Int'l Dict.* 1184 (14th ed 1961)). However, their actions constitute more than mere silence or inaction in response to plaintiff's concerns about his disability. If proven, plaintiff's evidence shows that Sgt. Goff and Sedlacek diverted plaintiff away from the concerns he expressed regarding how his disability "interfered" with his ability to meet the physical demands of the academy, thereby meddling in or hampering plaintiff's exercise or enjoyment of his right to request an accommodation. *Bachelder v. America West Airlines, Inc.*, 259 F.3d 1112, 1124 (9th Cir. 2001) (recognizing, in the FMLA context, "employer actions that deter employees' participation in protected activities constitute 'interference' or 'restraint' with the employees' exercise of their rights"); *Castellano v. Access Premier Realty, Inc.*, 181 F. Supp. 3d 798, 809 (E.D. Cal. 2016) (finding the defendants meddled where their actions would give a person in the plaintiff's "position pause in seeking to enforce her right to obtain a reasonable accommodation for her handicap").

Plaintiff has also proffered evidence that he suffered a distinct and palpable injury as a result of defendants' interference, i.e., that he gave up his right to seek a reasonable accommodation. *See Brown*, 336 F.3d at 1193 (holding that an "injury could consist of either the giving up of her ADA rights, or some other injury which resulted from her refusal to give up her rights, or from the threat itself"). Finally, the allegations meet any causal-link requirement if one

exists.  Instructing plaintiff not to speak about or bring up his disability is related to his right to ask for a reasonable accommodation for that disability.

The State argues that the evidence contains no "blatant threats of negative repercussions for filing an ADA claim."  State's Mot. Summary J. 7, ECF 87.  But § 503(b) allows for alternative theories, including "coercions, threats, intimidation, *or* interference."  42 U.S.C. § 12203(b) (emphasis added).  The State also contends that "plaintiff was not someone who was unaware about ADA requests and was afraid to ask," and that he was not "ashamed of or secretive about his heart condition."  State's Mot. Summary J. 10, ECF 87.  The record reflects that plaintiff disclosed his heart condition at his initial medical examination, to other students, and to his Sgt. Goff and Sedlacek, among others.  But, critically, when plaintiff described to Sgt. Goff and Sedlacek how his permanent heart condition interfered with his ability to meet the physical requirements of the academy, they told plaintiff to "[k]eep this to yourself" and not tell other instructors at the academy.  Sgt. Goff and Sedlacek deny that they made these statements; however, on summary judgment, the evidence must be examined in the light most favorable to plaintiff, and plaintiff's testimony creates a genuine issue of material fact as to whether defendants meddled in or hampered his exercise or enjoyment of the right to request an accommodation.

Finally, the State argues that interference is not a standalone claim, but must be tethered to a discrimination claim.  State's Mot. Summary J. 7, ECF 87.  The State contends that, because plaintiff's other claims against the State have been dismissed, plaintiff's interreference claim against the State also must be dismissed.  This issue was previously discussed at length by this court, and the analysis does not need to be repeated here.  Findings and Recommendations 5-10

(ECF 65), *adopted by* Order (ECF 67).[10]  Courts have recognized a standalone claim of interference under the "in the exercise or enjoyment" prong of 42 U.S.C. § 12203(b).  *See Breimhorst v. Education Testing Service*, No. C-99-CV-3387, 2000 WL 34510621, at *7 (N.D. Cal. Mar. 27, 2000) ("The plain words of [§ 503(b)]. . .preclude a party from intimidating or coercing another party *not* to exercise his rights under the ADA, as well as barring interference against a person who has exercised his rights under the ADA.") (emphasis in original); *Bingham v. Oregon Sch. Activities Ass'n*, 24 F. Supp. 2d 1110, 1118-19 (D. Or. 1998) (finding plaintiff showed a likelihood of success on the merits of a § 503(b) claim where a policy that allowed for the "possibility of sanctions" had a "coercive and intimidating effect" on the plaintiff and "clearly operates to dissuade disabled student-athletes from exercising their rights to petition the courts for redress"); *Doe v. Kohn Nast & Graf, P.C.*, 866 F. Supp. 190, 197 (E.D. Pa. 1994) (finding lawyer stated a § 503(b) claim when his law firm asked him to leave after learning he planned to sue the firm for refusing to renew his employment contract after discovering he was HIV positive, but before the lawyer took any protected action); *see also Annenberg*, 818 F. App'x at 678 (holding a plaintiff "must, at a minimum, identify a right to which she was entitled under the ADA and allege that the District interfered with that right in some way") (citing 42 U.S.C. § 12203(b)).[11]

---

[10] No party made objections to these Findings and Recommendations, and since then all parties have consented to magistrate judge jurisdiction.

[11] In his response to the State's motion for summary judgment, plaintiff also argues in support of his claim brought under the Rehabilitation Act of 1973.  These arguments are moot in light of the order dismissing all of plaintiff's claims against the State except the interference claim.  *See* Findings and Recommendations 35, ECF 65, *adopted by* Order, ECF 67.

**ORDER**

The City's Motion for Summary Judgment (ECF 89) is granted as to plaintiff's

discrimination claim based on disparate impact and failure to engage in the interactive process,

but denied as to the disparate treatment claim.  Defendants' motions for summary judgment

(ECF 87, 89) against plaintiff's interference claim are granted in part and denied in part as

outlined in this opinion and order.

DATED October 17, 2023.


_____
/s/ Youlee Yim You
Youlee Yim You
United States Magistrate Judge