UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

LOU COLASANTI,

        Plaintiff,

    v.

CITY OF PORTLAND and STATE OF
OREGON,

        Defendants.

Case No. 3:19-cv-00443-YY

OPINION AND ORDER

Following a jury verdict in favor of defendant City of Portland on plaintiff's claims of

disability discrimination under the Americans with Disabilities Act ("ADA") and O.R.S.

659A.112, the court held a bench trial on plaintiff's remaining equitable claim of ADA

interference against the City and the State of Oregon. This Opinion and Order comprises the

findings of fact and conclusions of law required by Federal Rule of Civil Procedure 52(a). The

court has considered the sworn testimony received during the bench trial, the exhibits and

transcripts of prior testimony submitted by the parties, and the parties' arguments, and finds in

favor of defendants.[1]

## I.    Relevant Law and Scope of Plaintiff's Interference Claim

Section 503(b) provides:

---

[1] Although this Opinion and Order does not recount all of the evidence presented at the bench
trial, the court has considered it all in reaching this verdict.

> It shall be unlawful to coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of, or on account of his or her having exercised or enjoyed, or on account of his or her having aided or encouraged any other individual in the exercise or enjoyment of, any right granted or protected by this chapter.

42 U.S.C. § 12203(b). Plaintiff's interference claim is limited to the first prong of § 503(b), that the City and State interfered with him "in the exercise or enjoyment of" his rights under the ADA, and to the actions of Portland Police Bureau Sgt. William Goff, plaintiff's training supervisor, and Lt. Donald Sedlacek, a class coordinator at the State's Department of Public Safety Standards and Training ("DPSST") academy.[2] *See* Findings and Recommendations 11-18, 32-34, ECF 65, *adopted by* Order, ECF 67; Opinion and Order, 13-24, ECF 124.

To prevail, plaintiff must identify an ADA-protected right, show that defendants interfered with the exercise or enjoyment of that right, and prove that he suffered a distinct and palpable injury as a result. *See Brown v. City of Tucson*, 336 F.3d 1181, 1194 (9th Cir. 2003); *Annenberg v. Clark Cty. Sch. Dist.*, 818 F. App'x 674, 678 (9th Cir. 2020). The Ninth Circuit has yet to decide whether a plaintiff must also show a causal link between the protected conduct and the adverse action. *See Bayer v. Neiman Marcus Grp., Inc.*, 843 F. App'x 74, 75–76 (9th Cir. 2021) (recognizing that *Brown* "did not resolve the precise legal standard that applied," and finding that the plaintiff "presented sufficient evidence to prevail on his § 503(b) claim regardless of which legal standard applies"). However, courts across the country, including in the

---

[2] On summary judgment, this court found that none of the actions by either Goff or Sedlacek constitutes intimidation—there was no evidence in the record that their actions frightened plaintiff. *Walker v. City of Lakewood*, 272 F.3d 1114, 1129 (9th Cir. 2001)("'Intimidation' would require a showing that the City's activities had generated fear in the [plaintiff].") (citing *Webster's Third New Int'l Dict.* 1184 (14th ed 1961)); *see* Opinion and Order (October 17, 2023) 22, ECF 124.

Ninth Circuit, have required an additional causality and/or discriminatory intent element.[3] *See Bayer v. Neiman Marcus Grp., Inc.*, No. 13-CV-04487-MEJ, 2018 WL 2427787, at *7 (N.D. Cal. May 30, 2018) (citing *Frakes v. Peoria Sch. Dist. No. 150*, 872 F.3d 545, 550–51 (7th Cir. 2017), and collecting cases).

Requesting an accommodation is a protected ADA activity. *Coons v. Secretary of U.S. Dept. of Treasury*, 383 F.3d 879, 887 (9th Cir. 2004). The term "interfere" is not defined in § 503(b). The Ninth Circuit has instructed that the "construction and application of § 503(b) ought to be guided by [the court's] treatment" of the Fair Housing Act ("FHA") interference provision, "as well as similar provisions" in the Family and Medical Leave Act ("FMLA") and National Labor Relations Act ("NLRA"). *Brown*, 336 F. 3d at 1191. In the FHA context, the Ninth Circuit has defined "interference" as "the act of meddling in or hampering an activity or process." *Walker v. City of Lakewood*, 272 F.3d 1114, 1129 (9th Cir. 2001) (quoting Webster's Third New Int'l Dict. 1178 (14th ed. 1961)). The definition of "interference" is "broadly applied to reach all practices which have the effect of interfering with the exercise of rights under the federal fair housing laws." *Brown*, 336 F.3d at 1191 (citing *United States v. City of Hayward*, 36 F.3d 832,

---

[3] While this does not constitute an exhaustive list, the cases include: *Kelly v. Town of Abingdon, Virginia*, 90 F.4th 158, 171 (4th Cir. 2024) (applying the *Frakes* four-factor test); *Fernandes v. Criterion Child Enrichment, Inc.*, No. 4:21-CV-40124-MRG, 2024 WL 4393330, at *11 (D. Mass. Sept. 30, 2024); *Golden Gate Transactional Indep. Serv., Inc. v. California*, No. CV1808093SJOAGRX, 2019 WL 4222452, at *21 (C.D. Cal. May 1, 2019); *Baack v. Asurion, LLC*, No. 2:20-CV-00336-KJD-BNW, 2022 WL 22876260, at *4 (D. Nev. Mar. 7, 2022); *Lagervall v. Missoula County Pub. Sch.*, 2017 WL 3610549, at *5 (D. Mont. Aug. 22, 2017); *Youngblood v. Prudential Ins. Co.*, 706 F. Supp. 2d 831, 840 (M.D. Tenn. 2010); *see also Dedyo v. Baker Eng'g New York, Inc.*, 1998 WL 9376, at *11 (S.D.N.Y. Jan. 13, 1998) ("As other courts have commented, the *sine qua non* of an ADA claim is that the plaintiff was treated differently 'because of' his impairment."); *Michigan Prot. & Advoc. Serv., Inc. v. Babin*, 18 F.3d 337, 347 (6th Cir. 1994) (requiring discriminatory animus in the context of an FHA interference claim).

835 (9th Cir. 1994) (analyzing the FHA's anti-interference provision)). However, "[c]learly, antiinterference provisions such as those contained in the FHA and ADA cannot be so broad as to prohibit 'any action whatsoever that in any way hinders a member of a protected class.'" *Id*.

In *Brown*, the Ninth Circuit found that some of the conduct the plaintiff complained about did not rise to a violation under § 503(b), specifically comments by her supervisor that she was "sloughing off" and "goofing off," and reports that colleagues complained about her early departures and long lunches. *Id*. at 1193. However, the plaintiff also claimed she was threatened when her supervisor demanded that she cease her medications and work evening shifts or face demotion or forced retirement. *Id*. The Ninth Circuit found that these were "actionable threats" and the "allegations of direct harm resulting" from these threats, specifically, "short-term memory problems" and feeling "extremely stressed, harassed, and pressured," "would constitute a violation of § 503(b) if proven at trial." *Id*.

Because "[t]here is scant case law on ADA interference claims," other examples are hard to find. *Equal Emp. Opportunity Comm'n v. Geisinger Health*, No. CV 21-4294-KSM, 2022 WL 10208553, at *16 (E.D. Pa. Oct. 17, 2022). A case from the Northern District of California holds that requesting additional medical documentation and moving an employee to another work station does not constitute interference. *Santos v. Cnty. of Humboldt*, No. 22-CV-07485-RMI, 2023 WL 6882748, at *8 (N.D. Cal. Oct. 18, 2023). On the other hand, the D.C. Circuit has found that allegations an employer deliberately delayed the processing of an accommodations request and offered to grant an accommodation on the condition that the plaintiff executed a general release were sufficient to state a claim for unlawful interference. *Menoken v. Dhillon*, 975 F.3d 1, 11 (D.C. Cir. 2020).

## II.     Jury's Verdict

"[I]t would be a violation of the seventh amendment right to jury trial for the court to disregard a jury's finding of fact." *Floyd v. Laws,* 929 F.2d 1390, 1397 (9th Cir. 1991). "Thus, in a case where legal claims are tried by a jury and equitable claims are tried by a judge, and the claims are 'based on the same facts,' in deciding the equitable claims 'the Seventh Amendment requires the trial judge to follow the jury's implicit or explicit factual determinations.'" *Los Angeles Police Protective League v. Gates*, 995 F.2d 1469, 1473 (9th Cir. 1993) (quoting *Miller v. Fairchild Indus.,* 885 F.2d 498, 507 (9th Cir. 1989)).

Here, a jury found that, when plaintiff was employed as a police officer with PPB, he had a physical impairment that substantially limited one or more major life activities. However, the jury found that plaintiff failed to prove by a preponderance of the evidence that he was a "qualified individual," i.e., an individual with a disability who, either with or without a reasonable accommodation, can perform the essential functions of a PPB police officer.

Defendants have argued that, because the jury found no reasonable accommodation would have enabled plaintiff to perform the job, he cannot establish that he suffered an injury as the result of defendants' alleged interference with his right to request an accommodation. Plaintiff claimed that he is entitled to nominal damages as a form of equitable relief. This court recognized that "nominal damages as equitable relief are not automatic," but may be necessary to secure "complete justice" in certain circumstances. Opinion and Order (June 18, 2025) 3, ECF 241 (citing *Bayer v. Neiman Marcus Group, Inc.*, 861 F.3d 853, 873 (9th Cir. 2017), *Do v. Arizona State Univ.*, No. CV-22-00190-PHX-JJT, 2025 WL 871015, at *6 (D. Ariz. Mar. 20, 2025)).

As discussed below, plaintiff has failed to meet his burden of proving defendants interfered with his right to request an accommodation. Therefore, the court need not reach the issue of whether plaintiff suffered an injury.

## III.    Evidence and Analysis

Plaintiff has a congenital heart defect called Tetralogy of Fallot, and had four open-heart surgeries by the time he applied to be a police officer with PPB. Pl. Decl. ¶¶ 3-5, Ex. 169.[4] In applying to be a PPB officer, plaintiff signed a medical release for the City to receive all of his medical records. *Id.* ¶ 17. In late 2017, plaintiff completed a pre-hire medical examination and was medically cleared to be a police officer with PPB, with the exception that he could not be tased. *Id.* ¶ 23; Ex. 15. Plaintiff's medical forms do not indicate that he suffered from "fatigue," Ex. 112 at 3, or "chronic fatigue," Ex. 15 at 14, or had any "current medical conditions." *Id.* at 13.

After plaintiff was appointed as a PPB police officer on January 4, 2018, he was provided with a copy of the City's Human Resources Administrative Rule 2.02 "Prohibition Against Workplace Harassment, Discrimination, and Retaliation," that contained a section titled "Disability Accommodation Required." Ex. 115 at 3. It stated that the City was committed to providing reasonable accommodations to employees with disabilities and the accommodation form could be found in the Forms section of the HR website. *Id.* On January 11, 2018, plaintiff signed a written acknowledgement that he had "received and read the City of Portland's

---

[4] Citations to the record are provided where possible; however, some evidence consists of testimony from the bench trial, and no official transcript had been prepared at the time this Opinion and Order was issued.

workplace harassment, discrimination, and retaliation policy (Human Resources Rule 2.02)."[5]
Ex. 114.

Plaintiff's employment was contingent upon maintaining DPSST certification, Ex. 17,
and plaintiff was enrolled in the DPSST Basic Police Academy shortly after he was hired.
Pursuant to DPSST rules and regulations, all students must receive a 75 percent score on the
midterm and final exam.[6] Failure to receive a 75 percent score on the midterm or final exam
results in immediate dismissal. Pl. Dep. 136. Plaintiff received less than a 75 percent score on the
midterm and was thereafter terminated from the academy.

### A.    Plaintiff's Testimony

Plaintiff first approached Goff at the Airport Way training center on January 16, 2018. Pl.
Decl. ¶ 31, Ex. 169. He disclosed his history of four open-heart surgeries and that his doctor
reported his heart monitor was showing some arrythmias. Tr. (Feb. 24, 2025) 42-43, ECF 247.
Plaintiff said he could not be tased because of his congenital heart defect, and asked, "Is that
okay?" Pl. Dep. 48, 103, ECF 250. Goff replied that they no longer tased recruits. *Id.* at 48.
Plaintiff asked Goff who else needed to know about his heart condition before he got to the
DPSST academy, and claims Goff "response was that it probably won't be an issue, and I should
keep it to myself." Tr. (Feb. 24, 2025) 42-44. Plaintiff told Goff that he had failed the pre-
Oregon Physical Abilities Test ("ORPAT") and he did not want his instructors at DPSST to think
he was lazy if he became fatigued. Goff responded that "would probably not be an issue." Pl.

---

[5] At the bench trial, plaintiff testified that before he received a conditional offer of employment
from PPB, no one told him any steps he could take to request accommodations or refer him to
anyone at human resources who could assist with accommodations. Plaintiff testified that,
regarding how to request accommodations, "someone"—either a doctor or Mary Pierce, a nurse
practitioner—told him, "Just make sure your supervisors know," but he was "fuzzy on it."
[6] *See* O.A.R. 259-008-0085(21)(a)(B) (indicating "[s]uccessful completion" of the Basic Police
Course includes "a minimum score of 75% on the midterm exam and final exam").

Dep. 49. Plaintiff described that when Goff told him to "keep it to yourself," "[i]t was a little bit of a warning tone." Tr. (Feb. 24, 2025) 44.

Plaintiff described the pre-ORPAT as "nearly identical" to the ORPAT. When he failed the pre-ORPAT at the Airport Way training center, he requested an accommodation by approaching an officer in a PPB uniform and an "HR person." Plaintiff testified, "I asked to retake it and said, 'Hey, I got this heart condition. Can you guys cut me some slack maybe?'" Tr. (Feb. 27, 2025) 27. Plaintiff might have used the word "help." *Id.* His request was granted, and he passed on his second try.

On January 19, 2018, three days after speaking with Goff, plaintiff texted all of his classmates that he was born with "serious heart issues," had four open heart surgeries, and could fatigue easily, but he was "all repaired and good now." Ex. 117. He added, "I still plan on kicking ass and need no special treatment." *Id.* Plaintiff testified that he was "very open" about his heart condition and not "shy" about it. When asked whether he kept his medical condition confidential, plaintiff answered, "Absolutely not. I informed so many people." Tr. (Feb. 24, 2025) 55. Plaintiff's "personal philosophy" was to fight through the fatigue and heart issues, including while he was as the academy, because "they're always there" and "[i]t's my only option."

On January 22, 2018, plaintiff and some of his classmates failed the ORPAT. Pl. Decl. ¶ 44, Ex. 169. According to plaintiff, "everyone was able to retake" the ORPAT and it was "scheduled automatically for every student throughout the course curriculum." After plaintiff did not pass the ORPAT, he was concerned about some of the symptoms he was experiencing, "so despite Sergeant Goff's instructions not to tell anyone at the academy about [his] heart defect," he told the ORPAT instructor, JD Edwards, that he had a congenital heart defect and was

fatigued, coughing, had difficulty breathing, dizzy, and tasted blood in his mouth. Pl. Decl. ¶¶ 44-45, Ex. 169.

On January 24, 2018, plaintiff met with Goff in the DPSST cafeteria[7] and expressed concern that his heart defect was interfering with his ability to pass the ORPAT. Pl. Decl. ¶ 50, Ex. 169. He said that he had tasted blood in his mouth, and experienced dizziness, coughing, and problems breathing. *Id.* Goff did not give him advice or tell him to do anything, and said there would be additional chances to pass the ORPAT and he should train past it. *Id.* Plaintiff responded that he would "train my ass off," although he was not sure he would ever be able to pass the ORPAT due to his heart condition. *Id.* He again described his heart condition to Goff, who repeated everything back to him. *Id.* Goff told plaintiff that other people struggle with driving and shooting and sometimes need to be re-tested in those areas. *Id.* Plaintiff claims he expressed concern that he was not sure he could ever pass the ORPAT, and Goff said he would tell the instructors about plaintiff's heart condition but then paused and said, "On second thought, I think I should have you tell all the instructors for legal reasons." *Id.* ¶ 51; Pl. Dep. 105. Plaintiff testified he asked Goff if he should write them an email, and Goff responded, "No, don't send them an email," Tr. (Feb. 24, 2025) 60, and "left it up to me and gave me no real direction." Tr. (Feb. 25, 2025) 96. At the bench trial, plaintiff described that Goff gave him mixed messages and said he was "leaving the decision" up to him, like "this is all on you kid, good luck." Plaintiff testified that Goff did not tell him to speak with someone in human resources about his heart and

---

[7] Plaintiff described that he had two conversations with Goff in the cafeteria, but they "blur together." Pl. Dep. 62. At the bench trial, plaintiff testified that one of those conversations occurred on January 14, 2025, but the conversations "merge kind of into one my memory bank" and he was a "little fuzzy" on the timing.

did not refer to any City policies regarding the ADA or tell plaintiff there was a procedure he should follow under the ADA.

Plaintiff approached Sedlacek on January 26, 2018, after James Stradley, someone who was "very high up at the DPSST academy," berated his class about its poor passage rate on the ORPAT. Pl. Dep. 129. Plaintiff complained to Sedlacek that he did not appreciate Stradley's remarks, described that he had been "struggling" on the ORPAT, and "told him who else needs to know about my condition." *Id.* at 49. He claims Sedlacek replied, "You don't need to go running around telling anyone else. Students in the past have made excuses." *Id.* at 253. Plaintiff testified that he asked Sedlacek, "Is there any way I could have help with training? Is there anything you can do? I'm tired, and I don't know if I can pass the ORPAT," to which Sedlacek replied, "If anyone has a problem, they can come talk to me. Don't tell your other instructors." *Id.* at 49–50. Plaintiff explained that Sedlacek shared he also had a heart condition, which plaintiff thought was "great," but he "really didn't appreciate the part where" Sedlacek said "students have made excuses in the past," and described the conversation as "really kind of a mixed emotion interaction with him." *Id.* at 253-54. Plaintiff described "[t]he tone was implied that if I told other people, they would think I was like the students in the past who had made excuses." *Id.* at 254. When asked whether anyone at DPSST actually told him, "Do not tell anybody about your heart condition," plaintiff testified that Sedlacek "implied that."[8] *Id.* at 255. Plaintiff claimed that, while he was attending the DPSST academy, no instructors, coordinators, or managers referred him to the State ADA coordinator to obtain information about how to seek

---

[8] At the bench trial, plaintiff was asked, "Isn't it true Mr. Sedlacek never told you do not tell other people about your condition?" and plaintiff responded, "Not in those direct words, but it was implied."

disability accommodations or told him that a request for accommodation needed to come from the City.

On January 31, 2018, after speaking with Goff and Sedlacek, plaintiff completed the DPSST Defensive Tactics Program Acknowledgement of Safety Rules form in which he reported "no *new* injuries" that "would interfere with my ability to perform any of the physical tasks noted on the DPSST Critical & Essential Tasks List." Ex. 118 (emphasis in original). He also checked the box that stated "*regardless* of having provided a signed physician's release, if I cannot perform any one or more of the physical tasks noted in the DPSST Critical & Essential Tasks list for my discipline, I will not be allowed to continue training until I complete a new medical exam." *Id.* (emphasis in original). Plaintiff admitted that during the time he was at the DPSST academy, he had a full medical release to train there, except that he could not be tased.

Plaintiff described that, after his classes, he would work out at the gym, "hit the treadmill very, very hard," lift light weights,[9] and "work out as much as [he] could outside the scheduled class time to try to pass th[e] ORPAT." Tr. (Feb. 24, 2025) 71-72. He spent his weekends working out, because he "saw no other options," and continued to feel worse and worse.[10] *Id.* at 72.

---

[9] Plaintiff's doctor advised him to avoid lifting heavy weights, including bench press and dead lifts, i.e., anything that could produce Valsalva. Tr. (Feb. 24, 2025) 44. At the bench trial, plaintiff testified that push-ups made him very fatigued. Plaintiff lifted lower weights consisting of five to nine pounds. Tr. (Feb. 25, 2025) 43. His pulling limit was restricted to anything that would induce undue fatigue. *Id.* at 45. The dummy that students were required to pull during the ORPAT weighed 150 pounds. *Id.* at 44. The pre-ORPAT had the same requirement and plaintiff was able to pull the dummy, albeit with difficulty.

[10] Although plaintiff worked out on the weekends, the students were not given work on the weekends. Goff explained "[t]heir weekends are theirs" and "[i]t's their day off." Tr. (Feb. 25, 2025) 53.

At one point, plaintiff spoke about his medical condition with Scott Willadsen, the defensive tactics coordinator, who told him that if he was not able to fully participate in training due to a medical condition, he would be removed from training and reevaluated by a doctor. Tr. (Feb. 24, 2025) 56. Willadsen asked plaintiff if he was able to train, and plaintiff responded, "yes." *Id.*

"Going into the mid-term test" on March 5, 2018, plaintiff "felt extremely fatigued and ill" because he had been physically training all weekend, and he was fatigued and overwhelmed on the morning of the test. Pl. Decl. ¶ 61, Ex. 169. He was coughing at night, which prevented him from sleeping, and he was exhausted from lack of sleep. *Id.* ¶ 62. After he did not pass the mid-term, plaintiff told Goff and Sedlacek that he did not do well on the test because he was fatigued from his heart condition, not sleeping well due to coughing, and exercising constantly to try to improve his ability to pass the ORPAT. Pl. Decl. ¶ 62. Plaintiff admits that he did not call in sick, although the DPSST Student Rules and Regulations contained an illness policy. Pl. Dep. 112; *id.*, Ex. B. Plaintiff also admitted that the handbook directed students to talk with staff about their health concerns.

In sum, plaintiff described that there were "three times my instructors let me down." Pl. Dep. 50. Plaintiff testified that he asked both Goff and Sedlacek "who else I needed to talk about all this," and "both times, I was told to keep quiet." Pl. Dep. 105. He claims, "They silenced me when my life was on the line. . . . They told me . . . to not tell anyone else. They told me that others had made similar claims and that people would think I'm making excuses. I went to them for help, and I was told to be quiet." *Id.* Due to the "militaristic police academy setting," plaintiff perceived their instructions were an "order." *Id.* at 120. Plaintiff also testified that he did not want to go over "Goff's head" due to the police department's militaristic hierarchy.

Plaintiff claimed that, unlike his experience in Minnesota where people were "willing to help [him] out," his experience in Portland was "totally different," like being in an "alien environment" and "almost like . . . a foreign country." Plaintiff pointed to his PPB offer letter, which plaintiff characterized had "some sort of weird kind of quota system," and "kind of a 'take a ticket' kind of thing." The letter stated in pertinent part:

> Continued employment is contingent upon a police officer
> maintaining the appropriate certification with DPSST. Due to the
> unique nature of police work, the Bureau has a limited capacity to
> accommodate employees who have temporary work restrictions or
> are individuals with a disability, The Bureau has a maximum
> number of alternate placements for permanent employees.
> Although there is no guarantee that an accommodation will be
> available in the event of a request, each employee's circumstances
> will be assessed in accordance with City and Bureau policies.

Ex. 17 at 2. Plaintiff acknowledged that the letter, which was signed by the Human Resources Manager, also stated, "If you have any questions concerning the conditions of your employment, please give me a call at your earliest convenience," and "I am happy to provide whatever assistance I can to make your transition a smooth one," *id.*, but he never reached out to the manager.

Plaintiff denied that he was ever referred to the City's human resources policy on discrimination, contrary to his signed acknowledgement that he had "received and read the City of Portland's workplace harassment, discrimination, and retaliation policy (Human Resources Rule 2.02)." Plaintiff testified that, other than his classmates, people "generally" were "not really" kind to him, "not at all." This was contradicted by a written statement plaintiff provided when appealing his termination, in which he stated that he was "honored to have such great instructors who did receive what limited aspects were explained about my health concerns with kindness." Ex. 1003.

### B.    Goff's Testimony

Goff recalled that plaintiff approached him at the Airport Way training center and discussed his heart condition. Tr. (Feb. 25, 2025) 11. Goff testified that he "basically told [plaintiff] he could do whatever he likes," and he "didn't tell him to or not to." He "just said, . . . 'If you want to share any information, you go ahead and share it.'"

Goff recalled a second conversation with plaintiff in the DPSST cafeteria during which plaintiff explained his heart condition, but Goff did not "really understand . . . the terminology." Tr. (Feb. 26, 2025) 11-12. Plaintiff told Goff that he did not pass the ORPAT and said he was going to "work really hard," he was "going to get this," and he was "dedicated to be here." *Id.* at 12. In Goff's opinion, plaintiff seemed "very proud of his hard work he was going to put into" it. *Id.* Plaintiff explained to Goff that his heart condition played a role in his ORPAT score, and said he was going to try to train past it, if he could. Tr. (Feb. 25, 2025) 16. Goff replied, "Great," and had all the confidence in plaintiff that he would pass the ORPAT. Tr. (Feb. 26, 2025) 12. Goff testified that he "didn't say anything" to plaintiff "about reporting, not reporting."

During a third conversation, which also occurred in the cafeteria, plaintiff again discussed his heart condition with Goff. *Id.* at 12. Goff testified that he was "there to support" plaintiff and "had nothing against him." Goff asked plaintiff, "Do you want me to tell your instructors about your heart?" Tr. (Feb. 25, 2025) 23; *see also* Tr. (Feb. 26, 2025) 12. Plaintiff responded affirmatively, but Goff decided "on second thought" that he should not do so because he did not want to get in trouble for reporting plaintiff's information to the wrong person. Tr. (Feb. 25, 2025), 23. Goff also thought it was "probably not a good idea for [him] to tell people about [plaintiff's] heart condition when [he was] not very versed in it," and plaintiff had the ability to tell them himself. Tr. (Feb. 26, 2025), 12. Goff told plaintiff that if he wanted to tell people about

his heart, he should just tell them. Tr. (Feb. 25, 2025), 23. He felt that if plaintiff had some

information he wanted to share, "it was best shared from him about his medical condition." Tr.

(Feb. 26, 2025), 12. He further explained that, in the Training Division, they always told

students, "You are driving your bus. You're an adult. We hired you. You have the ability to talk

to FTOs, your supervisors." *Id.*

Goff testified that he did not tell plaintiff to keep his heart condition to himself and never

discouraged plaintiff from sharing his health information. He did not perceive plaintiff to be

seeking or asking for anything, but rather expressing to Goff that he was proud of his own efforts

and that he was going to work hard and be successful. Goff described that, in his experience,

many students at the academy have problems of one kind or another, and they are not always

related to a disability.

Goff explained that he did not tell plaintiff that the City had an accommodation form he

could fill out because when individuals are hired, they are informed how to ask for an

accommodation, and he had been trained not to assume that someone needs an accommodation

but to wait for the person to ask for one. Tr. (Feb. 25, 2025) 19. As Goff explained:

> By assuming one person needs it over the other, it may be
> prejudice, all kinds of other things. If I think because someone
> comes to take a test and they may not be able to pass, if I offer
> certain things for it, I'm – I'm saying that maybe that person can't
> do it, and then he probably can do it, or something like that.

Tr. (Feb. 26, 2025) 16. Goff testified that if plaintiff had requested an accommodation, he would

have referred him to Human Resources, which has forms and paperwork and would have

discussed his request with him, as he had done in the past with other students who had asked for

help. *Id.* at 16-17.

Goff did not think he was required to take any action regarding the symptoms that plaintiff reported to him because plaintiff was recently cleared by a doctor and people experience different things when they perform the ORPAT, such as throwing up and being really tired. Tr. (Feb. 25, 2025), 80. When plaintiff described his symptoms, Goff asked plaintiff if "he needed anything," and plaintiff said he did not. *Id.* Goff testified, "He just wanted to me to know that he was going to strive to get better." *Id.* at 80-81. According to Goff, plaintiff never told him that he always had a baseline level of fatigue and did not request an accommodation. Tr. (Feb. 26, 2025) 36.

The weekly updates that plaintiff provided to Goff and Sedlacek also did not indicate he was struggling physically; in fact, they were "just the opposite." *Id.* In his weekly reports, plaintiff mentioned nothing about having any physical difficulties, and stated he was working out in the gym five days a week and "hitting the gym very hard." Exs. 119, 120. He described that he "continue[d] to see positive results in the realm of [his] physical fitness," "continue[d] to work hard in the gym," and was "excited to see more improvements as the weeks continue to progress." Ex. 121.

Goff was surprised that plaintiff did not pass the mid-term. He liked plaintiff and thought he was a nice guy, and spoke highly of him to his colleagues. After plaintiff failed the mid-term, Goff continued to support him, even making arrangements for plaintiff to stay at his home when he was terminated from the academy.[11] He encouraged plaintiff to file an appeal and referred him to the union representative, which was better able to assist him with the appeal.

---

[11] Generally, students who are terminated from the academy must leave that same evening, so Goff made an offer for plaintiff to stay at his house, which ultimately proved to be unnecessary because the academy allowed plaintiff to stay there.

### C.    Sedlacek Testimony

On January 24, 2018, plaintiff sent Sedlacek an email in which he stated that "[d]ue to a serious health condition," he could "fatigue easily." Ex. 20. Plaintiff stated, "This makes gym time critical. Furthermore, I refuse to be a victim and instead wish to live in positivity." *Id.* Sedlacek responded, "Good luck," and "Please let me know if I can be of any assistance with helping you," and ended the email by signing, "Take care, Don." *Id.*

Sedlacek has testified that, although he cannot recall the exact date, he had a conversation with plaintiff during which plaintiff "said he had a heart condition" and "he did not want [Sedlacek] to think that he was . . . or . . . have it look like he was intentionally not performing[.]" Sedlacek Dep. 20, ECF 247. Sedlacek told plaintiff that he understood about having a heart condition because he had one too. *Id.* at 21. He recalled giving plaintiff an example of a student who "was talking about having a serious knee issue, and so he . . . wasn't able to give all his performance in physical stuff, but yet he was out playing football in the yard." *Id.* at 21. Because plaintiff expressed concern about what other instructors thought of him, Sedlacek "wanted to reassure him that we have students who have used that before, but he had it documented," and "[i]f he has a documented" medical condition, "then it would not be a problem." *Id.* at 22. When asked whether he told plaintiff "that he didn't need to go around telling anyone else about his heart condition," Sedlacek responded that he could not recall exactly what his words were but he said "something to the effect of 'I don't want you feeling like you have to tell everybody all of your medical stuff'" because he "didn't want [plaintiff] feeling like everybody had to have all his personal information." *Id.* at 24. Sedlacek told plaintiff to "just let me know if you need something." *Id.* at 21.

Finally, Sedlacek testified that the DPSST student handbook stated that requests for accommodation had to come from the student's employing agency. *Id.* at 43.

### D.    Analysis

Plaintiff bears the burden of proving his interference claim by a preponderance of the evidence. "If upon any question in the case, the evidence appears to be equally balanced, or if the court cannot say upon which side the evidence weighs heavier, the question must be resolved against the party upon whom the burden of proof rests." *Wille v. Dana*, 962 F. Supp. 1334, 1336 (D. Or. 1997), *aff'd,* 198 F.3d 256 (9th Cir. 1999).

Plaintiff has not met his burden here. After considering the evidence presented by plaintiff and defendants, the court cannot conclude that it weighs heavier on plaintiff's side. Plaintiff has not provided a convincing reason why his testimony should be viewed as more credible than that of the defense witnesses. In fact, some of plaintiff's testimony was contradicted by other evidence in the record. For example, plaintiff testified that he was never referred to the City's human resources policy on discrimination; however, the record contains his signed acknowledgement that he "received and read the City of Portland's workplace harassment, discrimination, and retaliation policy (Human Resources Rule 2.02)" on January 11, 2018. Plaintiff's statements regarding his condition were also inconsistent. Although the handbook directed students to talk with staff about their health concerns, plaintiff did not indicate that he was struggling in his weekly reports to Goff and Sedlacek. When Willadsen asked plaintiff about his heart condition and whether he could still train, plaintiff replied "yes." And plaintiff reported "no *new* injuries" on the DPSST Defensive Tactics Program Acknowledgement of Safety Rules form, and acknowledged that if he could not perform one or

more of the required physical tasks, he would not be allowed to continue until he completed a new medical exam.

Additionally, while plaintiff claims he was "silenced" by Goff and Sedlacek, he continued to tell people at DPSST about his heart condition. After Goff allegedly told plaintiff in a "warning tone" to "keep it to himself," plaintiff nevertheless texted all of his classmates three days later and said he "was born with serious heart issues," had four open-heart surgeries, and could fatigue easily, but sought "no special treatment." Plaintiff testified that he was "very open" and not shy about his heart condition, and "despite Sergeant Goff's instructions not to tell anyone at the academy about my heart defect," plaintiff approached Edwards to discuss his heart condition. Plaintiff also overstated his case—when asked if he had ever been written up for insubordination, he responded, "Indirectly, yes," on the basis that he had failed the ORPAT and was shut down by Stradley for raising his hand to speak, but when pressed, plaintiff admitted that this did not actually constitute insubordination.

Moreover, Goff provided a reasonable explanation for why he did not assume that plaintiff was asking for help or requesting an accommodation, or refer plaintiff to HR for an accommodation form—except for being tased, plaintiff was medically cleared for police work the entire time he was at DPSST, and Goff was trained not to assume that an employee was asking for help because doing so could be perceived as discriminatory and suggest that Goff believed the person "can't do it" when he "probably can do it." Goff listened carefully to plaintiff's explanation about his heart condition enough to repeat it back to him, but was reluctant to share this information with the instructors because it was not his personal information to share and he did not want to misstate plaintiff's condition, which was complex. Goff further explained that plaintiff had been told how to request an accommodation. In fact,

when he was hired, plaintiff was provided with specific instructions to contact human resources, not his supervising officers, if he was requesting a disability accommodation. Additionally, Goff thought plaintiff was a nice guy, and spoke highly of him to other individuals. He was surprised when plaintiff did not pass the mid-term, and invited him to stay with him when he was terminated from the academy. He encouraged plaintiff to appeal his termination, and referred him to the union representative, who was better equipped to assist him with an appeal. Nothing about Goff's actions amount to meddling in or hampering plaintiff's right to request an accommodation.

The same is true for Sedlacek. When plaintiff emailed Sedlacek his list of goals and mentioned a "serious health condition" that caused him to fatigue at a fast rate, Sedlacek responded, "Good luck on them," "Please let me know if I can be of any assistance in helping you," and "Take care." When plaintiff spoke with Sedlacek, he never told plaintiff not to tell anyone; at most, plaintiff testified that Sedlacek "implied that." Plaintiff even testified that the conversation was "mixed" and Sedlacek shared that he also had a heart condition, which plaintiff viewed as "great." Sedlacek reassured plaintiff that if his medical condition was documented with records (unlike the prior students he described who did not have serious issues), "it would not be a problem," and told plaintiff he did not "have to tell everybody all of your medical stuff." Even by plaintiff's own account, Sedlacek told him, "[i]f anyone has a problem, they can come talk to me." This does not constitute meddling in or hampering plaintiff's right to request an accommodation.

As discussed above, the Ninth Circuit has not decided whether a plaintiff must prove that the defendant's interference was "motivated by" or "because of" the plaintiff's disability. If such

proof is required, there is no evidence that Goff or Sedlacek actions were "motivated by" or "because of" plaintiff's disability.

## ORDER

Plaintiff has not met his burden of proving his interference claim by a preponderance of the evidence. Therefore, a verdict is entered for defendants on this claim.

IT IS SO ORDERED.

DATED August 19, 2025.

/s/ Youlee Yim You
Youlee Yim You
United States Magistrate Judge

21 – OPINION AND ORDER